# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

Eugene Vent, Kevin Pease,
and George Frese,

RECEIVED

DEC 18 2017

CLERK, U.S. DISTRICT COURT
FAIRBANKS, AK

Plaintiffs,

v.

City of Fairbanks, James
Geier, Clifford Aaron Ring,
Chris Nolan, Dave Kendrick,
Doe Officers 1-10, and Doe
Supervisors 1-10,

Defendants.

## COMPLAINT AND JURY DEMAND
### (Seeking relief under 42 U.S.C. § 1983)

### INTRODUCTION

1. On Friday, October 10, 1997 Eugene Vent, an Athabascan originally from the village of Huslia, Alaska was 17 years old, a senior in high school, and residing with his mother and young siblings in Fairbanks. He spent much of his time caring for his much younger siblings and assisting his single mother in running their household. Kevin Pease was 19 years old, a high school senior, and resided in Fairbanks with his mother. Kevin and Eugene were high school classmates. They both spent that night until early morning October 11, 1997 at a house party in rural west Fairbanks with a large group of fellow high school aged friends. George Frese, 20, was a dedicated young father. He spent the night of October 10-11, 1997 with a group of friends.

2. The same night, five other young men spent the night driving through the streets of downtown Fairbanks looking for Alaska Natives to beat for fun. These racially motivated beatings were a hobby they had engaged in on other occasions. They attempted to assault an elderly Native man but he escaped. They continued to seek Native victims, and were about to give up when they spotted a fifteen year old white boy named John Hartman. They beat and kicked him until he lost consciousness. He died in the hospital later that weekend.

1

3.   Fairbanks police manufactured evidence to convict Eugene Vent, Kevin Pease, and George Frese along with Marvin Roberts. They came to be collectively known as "the Fairbanks Four." The Four were convicted of the murder of John Hartman, the assault of a man named Franklin Dayton, and the sexual assault of John Hartman, despite the testimony of dozens of witnesses who provided alibis for the accused, Dayton's own statements pointing to alternate perpetrators, and the abundance of evidence that Hartman was never sexually assaulted at all. The men spent eighteen years in prison for a crime they did not commit. On December 17, 2015 all charges were dropped against them and they were finally exonerated and released.

## JURISDICTION, VENUE, AND JURY DEMAND

4.   This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Eugene Vent, George Frese, and Kevin Pease's rights as secured by the United States Constitution.

5.   This court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 1343 and supplemental jurisdiction over state law claims under 28 U.S.C. § 1367(a).

6.   Venue is proper because this is the district in which the claim arose.

7.   Plaintiffs respectfully demands trial by jury on all issues in this case under Federal Rule of Civil Procedure 38(b).

## PARTIES

8.   Plaintiffs Eugene Vent, George Frese, and Kevin Pease are citizens of the Untied States of America and all reside in Fairbanks, Alaska.

9.   Defendant City of Fairbanks ("the City) is a Home Rule, First Class City and Municipal Corporation organized under the laws of the State of Alaska. It employed the individual defendants. It is responsible for the policies, practices, and customs of the Fairbanks Police Department ("FPD").

10.  Defendant James Geier was a FPD Detective and Lieutenant during all times relevant to this complaint and is currently employed as a FPD Lieutenant. He acted under color of law, within the scope of his employment and pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the FPD. He is sued in his individual capacity.

2

11. Defendant Clifford Aaron Ring was a FPD Detective during all times relevant to this complaint. He acted under color of law, within the scope of his employment and pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the FPD. He is sued in his individual capacity.

12. Defendant Chris Nolan was a FPD Detective and Lieutenant during all times relevant to this complaint. He acted under color of law, within the scope of his employment and pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the FPD. He is sued in his individual capacity.

13. Defendant Dave Kendrick was a FPD Sergeant during all times relevant to the complaint. He acted under color of law, within the scope of his employment and pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the FPD. He is sued in his individual capacity.

14. Defendants Doe FPD officers and supervisors cannot be named specifically because their identities are not yet known. They acted under color of law, within the scope of their employment and pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the FPD. They are sued in their individual capacities.

## FACTS

### The Murder of John Hartman and Assault of Frank Dayton

15. On October 11, 1997 William Holmes, Rashan Brown, Shelmar Johnson, Marquez Pennington, and Jason Wallace met up at a house party and departed together for the purpose of beating Alaska Natives for entertainment.

16. They came across Robert John, an Alaska Native in is early 60's, and attempted to assault him but were thwarted when he escaped into the Pastime Card Room, and a group of other Native men looked outside to see who had chased John.

17. Unable to find a solitary Alaska Native to attack, Holmes, Wallace, Brown, Pennington, and Johnson instead attacked 15-year-old John Hartman. They beat and kicked him to death. Hartman was white.

18. They drove Holmes' mother's maroon 1992 Ford Tempo with license plate number CUF508 and serial number 1FAPP36X2NK216949 on the night of the murder.

19. Another man, Alaska Native Franklin Dayton, was also assaulted on the streets of Fairbanks on the same night by a different group of young men.

3

20. Within one to two days of Hartman's murder Jason Wallace bragged to fellow high school students Scott Davison and Matt Ellsworth about killing Hartman.

21. Wallace later admitted killing Hartman to an investigator for the public defender.

22. Wallace went on to commit additional murders and attempted murders after killing Hartman, including beating a woman to death with a hammer prior to lighting her corpse and apartment on fire, stabbing a man with a screwdriver, and conspiring to murder five others, including a young child.

23. Holmes and Brown also went on to commit additional murders after killing Hartman, including the murder of a pregnant woman, and three men. All five of the real perpetrators went on to commit violent crimes with victims. If the FPD had pursued Holmes, Wallace, Johnson, Pennington, and Brown, at least five murder victims would still be living.

## CONVICTIONS OF THE FAIRBANKS FOUR

24. There was immense public interest in Hartman's murder, non-stop media coverage, and intense pressure on the City and FPD to arrest someone.

25. James Hayes was the Mayor of Fairbanks when Hartman was murdered. Prior to the Four's convictions, Hayes stated in the press that convicting the Fairbanks Four was so important that he had changed his previous plans to cut FPD's budget.

26. All the defendants in this case were aware of developments in this case for its entire tortured history.

27. The FPD intentionally convicted Eugene Vent, George Frese, Marvin Roberts, and Kevin Pease – the "Fairbanks Four" – of the murder of John Hartman and assault of Franklin Dayton knowing that they could not possibly have committed the crimes.

28. Kevin Pease is Native American, the rest of the Fairbanks Four are Athabascan Alaska Natives.

29. The Fairbanks Four were targeted by the FPD based on racial animus.

30. During the time when Hartman was being murdered and Dayton assaulted, Eugene and Kevin were in the company of six or more other teenagers across town, and George was traveling on foot with at least two witnesses. The fourth person convicted of the crimes,

4

Marvin Roberts—the one FPD alleged drove the car—was at a wedding reception at the Eagles Hall, where he was observed by many people dancing and socializing at the exact time Dayton and then Hartman were being assaulted.

31. Multiple witnesses confirm the plaintiffs' whereabouts during the time of the murder and assault.

32. FPD Detective Ring conducted much of the investigation that led to the plaintiffs' convictions.

33. Ring admitted that he had no evidence indicating the Fairbanks Four were guilty when he decided to focus the investigation on them.

34. Arlo Olson was drinking heavily and smoking marijuana on the night of October 11, 1997 at the Eagles Hall wedding reception in downtown Fairbanks.

35. Ring requested that Olson come to the station for an interview two days after the crime, and Olson refused. For the following week, Detectives Ring and Kendrick and Doe defendants repeatedly came by Olson's grandfather's apartment looking for Olson.

36. Kendrick eventually transported Olson to the FPD station to be interviewed. Olson reasonably believed he was in custody and that he was not free to leave the interrogation. Ring and/or Doe defendants interrogated Olson for two hours at FPD headquarters before they began recording of the interrogation.

37. Olson truthfully told the officers that while he was standing outside the Eagle's Hall, he had seen a beige four-door car and a scuffle but due to darkness and distance, he could not identify anyone involved.

38. Ring and/or Doe defendants had already decided to frame the Fairbanks Four as those who had had committed the crime while driving Marvin's blue, two-door, Dodge Shadow hatchback.

39. Ring and/or Doe defendants explained their theory of the case to Olson and coerced him to alter his testimony to be consistent with their version of events. FPD supplied Olson with confidential details including the identity of the four men the FPD wanted Olson to identify. They repeatedly insisted that the car he saw was not beige with four doors, but blue and two doors, and that the person driving had to be Marvin Roberts, and that Olson must have seen Kevin, Eugene, and George with him. They showed Roberts' blue car to Olson and told him that was the car he saw that night.

5

40. Only after successfully pressuring Olson into changing his testimony did the officers begin to record the interrogation.

41. As a direct result of the coercion by the FPD officer(s), Olson changed his testimony to state that he had been standing outside the wedding reception when the Fairbanks Four pulled up in a blue, two-door car and asked Olson if he wanted to get high. Olson stated that about half an hour after he first spoke with them, he saw the plaintiffs assault Dayton and leave in the same car. It was in fact physically impossible for Olson to have seen what he testified to seeing, given the distance.

42. Although most of FPD's recordings of witness interviews remain audible today, the recording of the interview with Olson was destroyed and is nearly completely inaudible.

43. After leaving the coercive interrogation, Olson again told the truth —that he could not identify who had attacked Dayton and did not want to testify at trial. Ring again threatened Olson and was again successful in suppressing the truth.

44. At trial, Olson was the only witness to state that any of the plaintiffs had participated in the attack on Dayton.

45. No witness placed any of the Fairbanks Four at the scene of Hartman's murder at 9th and Barnette, on the other side of downtown Fairbanks from the Eagles Hall.

46. Olson's testimony was crucial in securing the plaintiffs' wrongful convictions.

47. Olson eventually swore an affidavit admitting that his testimony was false. He testified to the true events in a deposition as part of the Fairbanks Four's postconviction relief ("PCR") proceeding, and reaffirmed that deposition testimony during the PCR trial.

48. Olson apologized to the Fairbanks Four and they forgave him. Olson committed suicide in 2017.

49. George Frese and Eugene Vent were intoxicated and sleep-deprived when interrogated on the night of the attacks and the following morning. Both experienced lengthy black outs the night before due to alcohol, and did not recall the events of the night.

50. Ring and other FPD officers violated basic investigative procedure by refusing to consider other suspects and using interrogation techniques that are known to yield false confessions.

51. Ring, Geier, Kendrick and/or Doe defendants conducted similarly coercive interviews of all four defendants, Olson, and many other young witnesses.

52. Ring and/or Kendrick and/or Doe defendants intentionally failed to record potions of Vent's interview because they were supplying Vent with details that were not public knowledge and Ring was coercing Vent to make a confession.

53. As a result of the coercive interrogation tactics, FPD was successful in coercing Frese and Vent to make false confessions, which they soon recanted.

54. Kevin Pease and Marvin Roberts never made any confession at any time and have always maintained their innocence.

55. Ring, Geier and/or Doe defendants threatened and harassed other young witnesses in the case including Shara David, Dana Andon, and Conan and Shawna Goebel.

56. Conan Goebel told Doe defendants he was with teach of the plaintiffs at different and critical points in the night, and they could not have committed the murder, but the FPD defendants threatened to arrest him, to make him a suspect in the case if he did not change his story. Goebel remained firm in the truth.

57. Chris Stone was with Hartman shortly before Hartman was killed and was interviewed by police, but that interview was concealed from the Fairbanks Four. Stone's interview would have led to alternate suspects.

58. Geier and/or Ring and/or Doe defendants intentionally withheld evidence that implicated other suspects, including statements made by Goebel and Stone.

59. Extensive forensic evidence was collected and analyzed by Kendrick and Doe defendants, including DNA from the crime scene, fingerprints, and scrapings from the victim's fingernails. None of it connected the Fairbanks Four to the attacks.

60. Deputy state medical examiner Franc Fallico testified to Hartman's cause of death and also stated that boot marks on Hartman's face matched the boots worn by George Frese, another one of the Fairbanks Four. Fallico had no training or qualifications to testify on the subject of footwear impressions.

61. Footwear expert Lesley Hammer re-examined Fallico's conclusions and testified at plaintiffs' PCR trial that his testimony was incorrect and lacked any scientific basis.

7

62. Fallico failed to use even the most basic principles, equipment, techniques, and procedures that are necessary to provide a reliable footwear analysis. Specific examples include his failure to compare the marks on the right or left side of the victim's head to the outsole of the of the boot, failure to examine all the available evidence, failure to create test impressions, misunderstanding of or disregard for the type of scale used, failure to use the correct methods of comparison, and failure to take into account damage and wear on the boots.

63. Kendrick, Ring, and Doe defendants were involved in examining the marks on Hartman's face and compiling comparisons between those marks and Frese's boots that were later relied on by Fallico.

64. Kendrick and Ring, and/or Doe defendants manufactured a deceptive trial exhibit of the bootprint overlaid on a photo of Hartman's face.

65. The manufactured evidence, especially the coerced confessions, Olson's false testimony, and the baseless bootprint evidence caused the plaintiffs to be convicted for murdering Hartman and assaulting Dayton, and for George and Eugene to also be convicted of the sexual assault of Hartman.

66. Eugene, George, and Kevin were convicted of murder, robbery, and assault for crimes they did not commit.

## CONSPIRACY TO PREVENT EXONERATIONS

67. In 2008, Scott Davison, who heard the 1997 confession of the true murderer Wallace, told Doe defendants that Wallace had admitted to killing Hartman. Doe defendants concealed Davison's statement and did not disclose it to the plaintiffs. If the FPD had disclosed Davison's statement to plaintiffs in 2008, they would have been exonerated seven years earlier.

68. In 2011, Holmes admitted to a California prison guard named Joseph Torquato that he was part of the group that killed Hartman. Holmes told the guard that there were innocent people in prison in Alaska for the crime, but he refused to come forward with the truth. Torquato drafted a memo describing Holmes' statment and sent it to the FPD.

69. Doe defendants assigned FPD Detective Chris Nolan to follow up on Holmes' 2011 confession.

8

70. FPD took no action for four years. FPD never shared Holmes' 2011 confession with the plaintiffs.

71. Six months later, under pressure from the prison guard to do the right thing, Holmes eventually wrote down what happened to Hartman and sent his confession to the Alaska Innocence Project. Holmes' confession was the most crucial evidence leading to the Fairbanks Four's exoneration.

72. After the PCR petitions that would ultimately lead to the exonerations were filed, Nolan notified Geier of Holmes' 2011 confession. The Alaska State Troopers, including Randy McPherron, investigated the Hartman murder as part of the PCR case. They found the Torquato memo regarding Holmes' 2011 confession in Geier's office.

73. At the evidentiary hearing on the PCR, McPherron testified that the Trooper investigation had generally been able to corroborate the Holmes confession and was unable to find any evidence placing the Fairbanks Four at the scene of the crimes. McPherron was critical of the FPD investigation.

74. If the FPD had disclosed Holmes' 2011 confession to plaintiffs, they would have been exonerated four years earlier.

75. A public information request was submitted to the City in 2013 for evidence that would assist in showing that Fallico's testimony regarding the boot marks was false. The City denied the request and also denied the appeal of the original denial. The evidence sought from the City in the request was exculpatory, and the City intentionally withheld it to prevent plaintiffs from being exonerated.

76. In 2014, Takory Stern, who was living at the Alaska Motor Inn in downtown Fairbanks on the night Hartman was murdered, asked to speak with FPD and gave them information that corroborated that Wallace, Holmes, Johnson, Brown, and Pennington killed Hartman.

77. FPD knew that Wallace had admitted to the murder when they interviewed Stern, but they only recorded a small portion of Stern's interview and did not disclose Stern's statement to plaintiffs.

78. If the FPD had honored the public information request and disclosed Stern's statement to plaintiffs, they would have been exonerated sooner.

## PLAINTIFFS ARE FORCED TO SIGN A RELEASE DISMISSAL AGREEMENT

79.     Eugene, George, and Kevin are innocent. They served 18 years for crimes they did not commit.

80.     The evidence establishing the Fairbanks Four's innocence was presented in the five-week long PCR trial in the fall of 2015. At the conclusion of the trial, Judge Lyle, the Alaska Superior Court Judge assigned to the PCR, estimated on the record that he would take six to eight months to reach a decision. Judge Lyle stated that if he ruled in favor of the Fairbanks Four, it might be necessary to retry the case.

81.     As a result of the horrific misconduct that became exposed through the litigation of the PCR, the State of Alaska offered to dismiss the indictments, remove the convictions, and free the plaintiffs if they would sign a release-dismissal agreement giving up their rights to pursue damages.

82.     The release prepared by the State included the City and its employees as released parties, despite the fact that the City was not a party to the PCR litigation and the State had the sole authority to dismiss the charges. The City gave no consideration for the releases.

83.     The plaintiffs signed the agreements knowing it was their only path to avoid a minimum of six to eight months of additional wrongful incarceration, after eighteen years.

84.     The bargaining position of the parties to the release dismissal agreement was so exceedingly unbalanced that plaintiffs effectively had no choice but to sign. Plaintiffs' signatures were coerced and involuntary.

85.     The facts of this case are so egregious and so well documented that it was impossible for the State to believe that plaintiffs' civil claims were frivolous when it forced them to sign the agreements. The State negotiated the release dismissal agreements for the purpose of preventing civil claims that it knew were valid. The defendants cannot meet their burden of proving that the release dismissal agreement should be enforced.

86.     The release dismissal agreements are unenforceable as a matter of public policy. It is not good public policy to coerce a citizen to give up something valuable in exchange for vacating wrongful convictions and releasing innocent men. The release dismissal agreement violates public policy and cannot be enforced such as to allow the defendants to avoid any accountability.

87.   Plaintiffs' wrongful convictions may have started in 1997, but they were perpetuated
      through 2015, and the defendants will continue to operate in the same manner in other
      cases unless plaintiffs are allowed to exercise their constitutional right to access the court.

**BACKGROUND OF CORRUPTION AND CONSTITUTIONAL VIOLATIONS**

88.   After plaintiffs were exonerated, the City launched an investigation into FPD misconduct
      surrounding his conviction and created a new diversity committee, calling the Fairbanks
      Four case "a black eye for the department."

89.   FPD Chief Randall Aragon stated that it no longer mattered whether the Fairbanks Four
      were innocent because they had been "turned loose."

90.   The facts of the plaintiffs' case must be considered in the light of the FPD's rampant
      corruption and long history of racially motivated persecution of Alaska Natives.

91.   11.74% of the residents of Fairbanks are Alaska Natives. 44.36% of the inmates of the
      Fairbanks Correctional Center are Alaska Natives as of 2014, the last date for which data
      is available.

92.   The FPD does not currently have any Alaska Native officers and did not have any in
      1997 when it was prosecuting plaintiffs.

93.   Mike Pulice was the head of the department of public safety (police chief) for the City.

94.   On or before January 2, 1996, Pulice was advised that guns, drugs, and over $500,000 in
      cash had been stolen from the FPD evidence room and were never recovered. Pulice
      withheld this information from Mayor James Hayes for over a month.

95.   Pulice was later implicated in the thefts, but no one was ever charged, and the missing
      guns, cocaine, and cash were never recovered.

96.   The thefts from the evidence room compromised ongoing criminal cases.

97.   The City Council and Mayor were made aware of the extent of the scandal and the
      evidence implicating Pulice in it. However, rather than address this most serious type of
      corruption, they made a conscious decision to sweep the scandal under the rug. They
      failed to fully investigate and imposed no serious consequences on Pulice. Their actions
      made clear that public perception of the FPD was their top priority, and they sent a
      message to the rest of the police force that rule breaking is tolerated.

11

98. Council member Wolting said this about the FPD on December 2, 1996: "that department [FPD] had been run amuck for quite some time. A lot of it never surfaced, and this goes way back to a lot of the chiefs that were in there. Some of them were promoted from the ranks and became what I would call a weak chief of police, and that can go back many years. And that sort of followed a trend. And I know from the heat that I took publicly and everything else, because I was going to hire a man, another man, come highly recommended back east, and Mr. Mayor, you probably remember that. The press got a hold of it, raised hell with it. Finally had to call Herb. We had to call the man tell him, no, he wasn't hired. And one of his greatest qualities was, he was known as a hit cleanup man. He went into departments that had trouble, and rotten departments, and that was in a sense his specialty. He would come in and he cleaned out departments. And this community would not let that man in here, and that was a human cry out here across the City. So then I turned internally, and there was Mike [Pulice]."

99. During discussion by the council over what to do about Pulice's handling of the evidence room thefts on December 2, 1996, Council member Allen stated, "I guess the way I approach this, the issue of punishing Mike is secondary almost to how are we going to rebuild public confidence and trust (indiscernible). That to me is primary. If you can give me a plan that Mike takes two weeks off and gets a letter of reprimand, and we have trust and confidence back in the police force, you know, that's great. To me that's -- right now that's the primary issue. That's the issue. I mean, what happens to Mike -- we're talking about an institution that is very important to the City of Fairbanks, and Mike, like all managers, has done good and has done bad, whatever; employee problems and whatever. But to me the issue isn't punishing one person if that doesn't bring back the trust and confidence in the police force. That is the issue, and i don't have a (indiscernible). I don't know. But to me that's the issue."

100. Council member Whitaker stated, "I don't think Mike [Pulice] should get railroaded over this. He knew there was a problem, he was trying to deal with it, she [evidence custodian] was aware that she was under investigation. You may say that she didn't -- wasn't, but I've been told that she was aware of it. I spend a lot of time with the cops. I know them pretty well... I think it's wrong that we would railroad a man who has given 22 years of his life to the City. Yeah, he's made some mistakes. Welcome to the human race."

101. The Fairbanks City Council in 1996 and 1997 was trying to put out one fire after another in the FPD caused by inept management, poor leadership, financial malfeasance, nepotism, sexual misconduct, and rampant corruption. 139. The mayor at the time, James Hayes, later was convicted of several federal felony crimes of dishonesty and was sentenced to 66 months in federal prison.

102. Pulice once admitted to the City Council that he operated in a gray area. The City encouraged him to continue operating in a gray area.

103. One of the gray areas in which Pulice operated was to threaten to frame or entrap people for crimes they did not commit.

104. Pulice told attorney Brett Wood that he was an expert in entrapment and had "set up" people during a conversation where he attempted to discourage public safety employees Jimmy Rice and Lee DeSpain from pursuing claims against the City.[1]

105. In 1997, the City and FPD were being run by a Mayor who was later convicted of stealing money from his church, and a police chief who eventually cost the City $1,600,000 for threatening to frame whistleblowers who had accused him of serious crimes.

106. Against this backdrop of rampant corruption, intimidation, and coercion, perpetrated and endorsed at the highest levels of city government, John Hartman was murdered.

107. The City used the Hartman murder to divert the public's attention away from the various scandals enveloping city government. The police department was under enormous pressure to make an arrest and secure a conviction, by any means available.

108. Former Anchorage Police Chief, and former State Commissioner of the Department of Public Safety, Ronald Otte has recognized that FPD's case against the Fairbanks Four was grievously flawed and he wrote an op-ed piece for the Alaska Dispatch News. Otte stated, "The rush to judgment by police investigators created a tunnel vision focus that, at times, resulted in sloppy and questionable police conduct... What we have learned in the years since the murder of a 15-year-old boy is that process and justice are probably not one and the same, at least not in this case. Justice for John Hartman and of the Fairbanks Four requires the commitment and courage to acknowledge mistakes and the resolve to find the truth. The only outcome worse than not solving a murder is convicting the wrong person while the real killer goes free."

109. As to how FPD handled their star witness, Arlo Olson, Otte stated, "the disgraceful way [Olson] was threatened, pressured and coached to give an eyewitness account that all involved should have known was not true is a reflection on the integrity of the entire investigation and prosecution."

---

[1] *See City of Fairbanks v. Rice*, 20 P.3d 1097 (Alaska 2000).

110. FPD Chief Randall Aragon was forced to resign in 2016 after it was discovered that he had refused to allow the FPD to provide security services to local businesses and instead told the businesses they had to pay him through his private security company.

111. The City lacks both the courage to acknowledge mistakes and the resolve to find the truth.

112. The City will never have the courage to admit mistakes or the resolve to find the truth unless and until it is held accountable for what it did to the Fairbanks Four.

113. Ring and Geier had a widespread practice of targeting and bullying Alaska Native youth.

114. Other individual Alaska Natives have had their constitutional rights violated by the FPD in the same way plaintiffs did.

115. FPD routinely discriminates against Alaska Natives.

116. At the time of events giving rise to this case, there was an especially high degree of racial tension between the Alaska Native community and the City.

117. The Alaska Native community has always known that the plaintiffs are innocent and has worked tirelessly to help them in any way that it can.

118. The Alaska Native community sees this case as a prime example of racial bias within FPD.

## CAUSES OF ACTION

### Violation of right not to be deprived of liberty as a result of the fabrication of evidence, right to fair trial, and right not to be deprived of liberty with due process of law under 4 U.S.C. § 1983

119. Defendant police officers, acting individually and in concert, deliberately coerced false testimony out of witnesses.

120. Defendant police officers, acting individually and in concert, reported information they knew to be false.

121. Defendant police officers deprived plaintiffs of their clearly established rights under the Fourth and Fourteenth Amendments to not be deprived of liberty as a result of the

14

fabrication of evidence by police, to have a fair trial, to not be deprived of liberty without due process of law, and to have FPD conduct a reasonable investigation.

122. Defendant police officers acted under color of state law, deliberately, intentionally, or with reckless disregard for the truth.

123. No reasonable officer at the time would have believed that the officers' conduct was lawful.

124. All facts are incorporated here, including the following. Ring, Geier, Kendrick, and the Doe defendants manufactured false witness testimony, especially the testimony of Olson. FPD defendants then reported information they knew to be false, such as Olson reporting that the car involved in the attack on Dayton was blue with two doors and that he could positive identify the plaintiffs as having participated in the assault of Dayton. Olson had no knowledge of those facts. FPD fed them to him and then coerced him into testifying that they were true.

125. Ring and/or Doe defendants turned off tape recorders during exculpatory testimony from witnesses and when they threatened witnesses, withheld exculpatory evidence, and refused to consider any alternate suspects.

126. As a direct and proximate result of the defendants' actions, plaintiffs were wrongfully convicted and imprisoned for 18 years causing them injury and damages.

**Malicious Prosecution under 42 U.S.C. § 1983**

127. Defendant police officers, acting individually and in concert, with malice and knowing that probable cause did not exist, caused plaintiffs to be arrested, charged, and prosecuted.

128. Defendant police officers violated plaintiffs' clearly established rights under the Fourth and Fourteenth Amendments to be free from unreasonable search and seizure and to be free from prolonged detention.

129. Defendant police officers acted under color of state law, deliberately, intentionally, or with reckless disregard for the truth.

130. No reasonable officer at the time would have believed that the officers' conduct was lawful.

131. All facts are incorporated here, including the following. Ring, Geier, and Doe defendants manufactured false witness testimony that directly resulted in plaintiffs' conviction while simultaneously turning off tape recorders during exculpatory testimony, withholding exculpatory evidence, refusing to investigate any alternate suspects, and threatening defense witnesses.

132. As a direct and proximate result of the defendants' actions, plaintiffs were wrongfully convicted and imprisoned for 18 years, causing them injury and damages.

### Deprivation of constitutional right of access to court and affirmative obligation to come forward with exculpatory evidence under 42 U.S.C. § 1983 and *Tatum v. Moody*[2]

133. All defendants possessed evidence that demonstrated plaintiffs' innocence and had an affirmative duty to come forward with that evidence beginning during the initial investigation in 1997 and continuing at least until they were exonerated in 2015.

134. Defendant supervisors were on notice of the concealment of exculpatory evidence, were recklessly indifferent to the failure to disclose exculpatory evidence, and had a custom and practice of depriving defendants of information that would prove their innocence.

135. Defendants violated plaintiffs' clearly established rights under the First and Fourteenth Amendments.

136. Defendant police officers and supervisors acted under color of state law, deliberately, intentionally, or with reckless disregard for the truth.

137. No reasonable officer at the time would have believed that the officers' conduct was lawful.

138. All facts are incorporated here, including the following. All FPD defendants even remotely connected to this case were aware of every detail of the case due to the extreme amount of political pressure and press coverage the case received when it was being investigated and prosecuted. All FPD defendants had knowledge that was exculpatory and was concealed. Ring knew Olson's testimony was false. Doe supervisors supervised Ring, had notice of both his history of constitutional violations and of his actions in this case including coercing false testimony out of Olson, had the opportunity to intervene by correcting the investigation before plaintiffs were convicted, and failed to do so. Geier and Doe supervisors knew of Holmes' admission in 2011 and knew no follow up was

---

[2] 786 F.3d 806 (9th Cir. 2014).

conducted and no disclosure made to Plaintiffs. Supervisors could have interceded by disclosing the information to plaintiffs or assigning another officer to follow up, but failed to do so. Doe defendants concealed Davison's statement, Ring and/or Doe defendants concealed Stone's interview, Nolan and Geier and Doe defendants concealed Holmes' 2011 admission, and the City obfuscated plaintiffs' efforts to get the exculpatory boot print analyses evidence. All of this evidence should have been produced. These actions were so consistent and pervasive they were clearly condoned by Doe supervisors.

139. As a direct and proximate result of the defendants' actions, plaintiffs were wrongfully convicted and imprisoned for 18 years, causing them injury and damages.

## Engaging in conduct that shocks the conscience of the court under § 1983

140. Defendants' deliberate efforts to manufacture evidence that would convict an innocent man shock the conscience and violate plaintiffs' clearly established right to substantive due process under the Fourteenth Amendment.

141. All facts are incorporated here, including Ring forcing Olson to testify to information he knew to be false in order to convict four Alaska Native men who the defendants knew to be innocent, and then having Geier, Nolan, and Doe defendants hide new evidence that revealed the true murderers, while plaintiffs suffered in prison for 18 years.

142. As a direct and proximate result of the defendants' actions, plaintiffs were wrongfully convicted and imprisoned for 18 years, causing them injury and damages.

## Supervisory Liability Under 42 U.S.C. § 1983

143. Defendant supervisors knew or were deliberately indifferent, reckless, or grossly negligent as to the violations of plaintiffs' clearly established constitutional rights by FPD officers.

144. Individual FPD officers acted in an environment where they were not trained, supervised, or disciplined.

145. Individual FPD officers acted in an environment where their violations of plaintiffs' constitutional rights and the constitutional rights of others were condoned by defendant supervisors.

146. The individual FPD officers committed constitutional violations with the approval and acceptance of supervisors in this and other cases.

147.  Supervisors had opportunities to intercede on plaintiffs' behalf but failed to do so.

148.  All facts are incorporated here, including the pervasive nature of racial animus, discrimination, racial profiling, and constitutional violations in the Fairbanks Police Department, the scandals involving Pulice, Aragon, and Hayes, Ring and the other FPD defendants intentionally convicting plaintiffs of crimes they did not commit, and the decades-long pattern of hiding exculpatory evidence that would have freed plaintiffs by Nolan, Geier, the City, and Doe supervisors. The pervasive and consistent nature of this conduct makes clear that it could not have occurred without supervisory approval and/or involvement.

149.  As a direct and proximate result of the defendants' actions, plaintiffs were wrongfully convicted and imprisoned for 18 years causing them injury and damages.

### Civil rights conspiracy claim Under 42 U.S.C. § 1933

150.  Acting in concert, defendants agreed among themselves and with other individuals to deprive plaintiffs of their clearly established constitutional rights.

151.  All facts are incorporated here, including the scandals involving Pulice, Aragon and Hayes, the decades—long effort to convict plaintiffs of crimes they did not commit starting with Ring, Kendrick, Geier, and Doe defendants in 1997, continuing through Doe defendants, Geier, and Nolan while plaintiffs were incarcerated, culminating with the City refusing to disclose the evidence needed to prove their innocence, and then the State forcing them to sign the release dismissal agreement under extreme duress, in violation of public policy. It would have been impossible for the defendants to have successfully convicted demonstrably innocent men and suppressed all evidence that could exonerate them so effectively without Ring, Geier, Kendrick, Nolan, the City, and Doe defendants agreeing to act in concert.

152.  As a direct and proximate result of the defendants' decades-long effort to keep plaintiffs in prison for decades for crimes they did not commit, plaintiffs were wrongfully convicted and imprisoned for 18 years, causing them injury and damages.

### 42 U.S.C. § 1985(3) Conspiracy

153.  Defendants were motivated by racial animus and agreed among themselves to act in concert to deprive plaintiffs of the equal protection of the laws.

154. Defendants had a history of targeting Alaska Natives.

155. All facts are incorporated here, including the history of Geier and Ring of targeting Alaska Natives, the larger percentage of Alaska Natives incarcerated by the criminal justice system, the decades-long effort to convict plaintiffs of crimes they did not commit starting with Ring, Kendrick, Geier, and Doe defendants in 1997, continuing through Doe defendants, Geier, and Nolan while plaintiffs were incarcerated, culminating with the City refusing to disclose the evidence needed to prove their innocence, and then the State forcing them to sign the release dismissal agreement under extreme duress. It would have been impossible for the defendants to have successfully convicted demonstrably innocent men and suppressing all evidence that could exonerate them so effectively without Ring, Geier, Nolan, the City, and Doe defendants agreeing to act in concert motivated by racial animus.

156. As a direct and proximate result of the defendants' decades-long effort to keep plaintiffs in prison for decades for crimes they did not commit, plaintiffs were wrongfully convicted and imprisoned for 18 years, causing them injury and damages.

## Claim against the City of Fairbanks under 42 U.S.C. § 1983 and *Monell v. Department of Social Services*[3]

157. The City and the FPD, by and through their final policy makers, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning constitutional violations like the violations described in this case. The City and the FPD policymakers were deliberately indifferent to the known and obvious risk that their policy, custom, or practice would lead to plaintiffs and other Alaska Natives being wrongfully convicted.

158. The City and the FPD had actual or constructive notice of constitutional violations and failed to investigate, train, supervise, or discipline FPD officers.

159. All facts are incorporated here, including the following. There was immense public interest in this case, non-stop media coverage, and intense pressure on the City and FPO to convict someone. All the defendants would have been aware of every development in this case for its entire, tortured history. Geier and Ring had a long history of targeting and profiling Alaska Natives. Scandals involving Pulice, Aragon, and Hayes show that the FPD has been infected with misconduct at its very highest level for decades. The other Alaska Natives who have had their constitutional rights violated in similar circumstances show that plaintiffs' case is all too common. The decades-long effort to convict plaintiffs of crimes they did not commit starting with Ring, Kendrick, Geier and Doe defendants in

---

[3] 436 U.S. 658 (1978).

1997, continuing through Doe defendants, Geier, and Nolan while plaintiffs were incarcerated, culminating with the City refusing to disclose the evidence needed to prove their innocence, and then coercing them to sign the release dismissal agreement under extreme duress, is clear evidence that violating the constitutional rights of Alaska Natives has become the policy or custom of the FPD.

160.    As a direct and proximate result of the defendants' misconduct, plaintiffs were wrongfully convicted and imprisoned for 18 years, causing them injury and damages.

### Violation of right to access the courts under 42 U.S.C. 1983 and the Alaska Constitution

161.    The defendants impeded plaintiffs' constitutional right to access the court by coercing him to sign the release dismissal agreement in violation of the U.S. and Alaska constitutions.

162.    All facts are incorporated here, including the involuntary release dismissal agreements.

163.    As a direct and proximate result of defendants' actions, plaintiffs were wrongfully convicted and imprisoned for 18 years, causing them injury and damages.

### Violation of right to receive exculpatory information under 42 U.S.C. § 1983 and *Brady v. Maryland*[4]

164.    Plaintiffs had a clearly established right to disclosure of all evidence that might exonerate them prior to trial and at all times between their trials and their ultimate exoneration in 2015.

165.    The City and the FPO defendants violated that right by withholding exculpatory evidence.

166.    All facts are incorporated here, including the following. Ring and Doe defendants withheld Olson's true testimony that the attackers drove a beige four-door car and that he could not identify who they were. Ring, Geier, and Kendrick intentionally failed to record portions their interrogations of Vent and other witnesses. Geier and/or Ring and/or Doe defendants intentionally withheld the statements of Goebel and Stone and others. Doe defendants withheld Davison's statement.  Nolan and Geier and Doe defendants withheld Holmes' confession.  Doe defendants withheld Stern's statement. The city withheld the

---

[4] 373 U.S. 83 (1963).

evidence needed to perform a complete boot impression analysis. All this evidence would have led to plaintiffs' exoneration.

## Spoliation of evidence under Alaska law

167. The defendants intentionally interfered with plaintiffs' prospective civil action by spoliation of evidence in violation of Alaska common law.

168. All facts are incorporated here, including Ring and Doe defendants manufacturing false testimony and withholding exculpatory evidence; Geier, Nolan, and Doe defendants hiding the subsequent admissions in 2008 and 2011; and the City refusing to comply with the public information requests in 2013.

169. As a direct and proximate result of defendants' actions, plaintiffs were wrongfully convicted and imprisoned for 18 years, causing them injury and damages.

## Negligence under Alaska law

170. The defendants had a duty to plaintiffs, breached that duty, and that breach was a substantial factor in causing plaintiffs harm in violation of Alaska common law.

171. All facts are incorporated here, including all the defendants convicting men they knew to be innocent and refusing to disclose the evidence that would allow them to prove their innocence, causing damages.

## Intentional or Reckless Infliction of Emotional Distress under Alaska law

172. The defendants engaged in extreme and outrageous conduct intentionally or recklessly causing severe emotional distress to Plaintiffs in violation of Alaska common law.

173. All facts are incorporated here, including the following. Ring and the other FPD defendants manufactured false testimony and withheld exculpatory information in order to convict plaintiffs of crimes it knew they did not commit. Geier, Nolan the other FPD defendants, and the City intentionally withheld exculpatory evidence to ensure that plaintiffs stayed in prison. Meanwhile the actual killers, who were known to the FPD, murdered additional people.

174. All facts are incorporated here, including all the defendants convicting men they knew to be innocent and refusing to disclose the evidence that would allow them to prove their innocence, causing severe emotional distress, physical injury, and damages.

21

## REQUEST FOR RELIEF

A. Declaratory judgment that the release-dismissal agreements are unenforceable.
B. Trial by jury.
C. Compensatory damages in an amount to be determined at trial.
D. Punitive damages against all defendants except the City.
E. Pre-judgment and post-judgment interest.
F. All costs including attorney fees under 42 U.S.C. § 1988, the Alaska Civil Rules, and any other applicable authority.
G. Any other relief to which they may be entitled.

DATED this 18th day of December, 2017, at Fairbanks, Alaska.

_____
Eugene Vent

_____
Kevin Pease

_____
George Frese

## REQUEST FOR RELIEF

A. Declaratory judgment that the release-dismissal agreements are unenforceable.
B. Trial by jury.
C. Compensatory damages in an amount to be determined at trial.
D. Punitive damages against all defendants except the City.
E. Pre-judgment and post-judgment interest.
F. All costs including attorney fees under 42 U.S.C. § 1988, the Alaska Civil Rules, and any other applicable authority.
G. Any other relief to which they may be entitled.


DATED this 18th day of December, 2017, at Fairbanks, Alaska.


_____

Eugene Vent

_____

Kevin Pease


_____

George Frese

## **REQUEST FOR RELIEF**

A. Declaratory judgment that the release-dismissal agreements are unenforceable.
B. Trial by jury.
C. Compensatory damages in an amount to be determined at trial.
D. Punitive damages against all defendants except the City.
E. Pre-judgment and post-judgment interest.
F. All costs including attorney fees under 42 U.S.C. § 1988, the Alaska Civil Rules, and any other applicable authority.
G. Any other relief to which they may be entitled.


DATED this 18th day of December, 2017, at Fairbanks, Alaska.


_____

Eugene Vent


_____

Kevin Pease


George Frese